## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **OPPORTUNITY FINANCE NETWORK**<br>123 S. Broad Street Suite 1930<br>Philadelphia, PA 19109<br><br>      Plaintiff,<br><br> v.<br><br>**CITIBANK, N.A.,**<br>5800 South Corporate Place<br>Sioux Falls, South Dakota 57108,<br><br>   **and**<br><br>**UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460,<br><br>   **and**<br><br>**LEE ZELDIN, in his official capacity as<br>ADMINISTRATOR, UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460<br><br>     Defendants. | **ECF CASE**<br><br>No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.  This case seeks to vindicate the rights of Plaintiff Opportunity Finance Network

("OFN") to access grant funds to which it is legally entitled. EPA, through its purported "Notice

of Termination," has unlawfully attempted to terminate OFN's grant and caused OFN's funds held

1

at Citibank, N.A. ("Citibank") to be withheld. OFN seeks to enjoin those ongoing, unlawful actions, which had nothing to do with OFN's performance under the grant.

2.      OFN received its grant funds under the Clean Communities Investment Accelerator fund ("CCIA"), which is part of the Greenhouse Gas Reduction fund ("GGRF") created by Congress in the Inflation Reduction Act ("IRA"), Pub. L. No. 117-169, 136 Stat. 1818.  As a result, the facts alleged and claims asserted herein are substantially similar to those asserted in six consolidated cases involving grants under the GGRF that are already before this Court, in which this Court recently issued a preliminary injunction. *See Climate United Fund v. Citibank, NA.*, No. 25-cv-698 (filed Mar. 8, 2025) (Dkts. 80, 89) ("*Climate United PI Decision*"). These cases include *Justice Climate Fund v. Citibank, NA.*, No. 25-cv-938 (filed Mar. 31, 2025) and *Inclusiv, Inc. v. EPA*, No. 25-cv-948 (filed Mar. 31, 2025) (collectively, the "CCIA Litigation"), as well as *Climate United Fund v. Citibank, NA.,* No. 25-cv-698-TSC (filed Mar. 8, 2025) (hereinafter *Climate United*); *Coalition for Green Capital v. Citibank, NA.,* No. 25-cv-735-TSC (filed Mar. 12, 2025); *Power Forward Communities, Inc. v. Citibank, NA.,* No. 25-cv-762-TSC (filed Mar. 14, 2025); and *California Infrastructure and Economic Development Bank v. Citibank, NA.,* No. 25-cv-820 (filed March 19, 2025) (collectively, the "NCIF Litigation").

3.      The GGRF provides financial assistance for "the rapid deployment of low- and zero-emission products, technologies, and services." 42 U.S.C. § 7434(c)(1). EPA administers the GGRF through three different programs: the CCIA, the National Clean Investment Fund ("NCIF"), and Solar for All. OFN's grant was awarded under the CCIA program.

4.      The CCIA provides financing for qualifying projects to reduce greenhouse gas emissions. CCIA grants are used by recipients to provide capital and technical assistance to smaller community lenders working in low-income and disadvantaged communities across the United

States, which, in turn, provide financing to support investments in qualifying projects undertaken by their respective lenders.

5.    OFN is a nonprofit organization and a leading national network of more than 470 Community Development Financial Institutions ("CDFIs") and mission-driven community lenders. CDFIs are lenders that specialize in lending to individuals, organizations, and businesses in under-resourced communities, helping those entities obtain financing that they typically could not obtain through traditional financing channels. OFN serves as a financial intermediary between CDFIs and public and private sector partners, including foundations, corporations, banks, government agencies, and others. OFN's mission—and the work of its network of CDFIs—is to ensure communities underserved by mainstream finance have access to affordable, responsible financial products and services, with a focus on serving low-income and underserved rural, urban, and Native communities across the United States.

6.    OFN has built a 40-year track record, managing billions of dollars in assets to deliver access to capital. It provides high-quality capacity-building events, trainings, toolkits, and other resources for CDFIs. And it provides access to affordable, responsible credit that finances community businesses, sparks job growth, and delivers sound financial returns. OFN has been a driving force in building safe and affordable housing, lowering energy costs, creating jobs, and improving water and air quality, and in turn, OFN has made the United States more competitive, secure, and energy independent.

7.    On October 10, 2023, OFN applied for CCIA grant funding from EPA. OFN was informed that it was selected as a CCIA grantee on March 31, 2024, and its award was memorialized in a final grant agreement on August 8, 2024. Since that date, OFN has diligently worked to carry out its responsibilities under the grant program.

8.      The CCIA grant requires OFN's grant funds to be held at Citibank, under a Financial Agent Agreement ("FAA") between Citibank and the U.S. Treasury Department ("Treasury"), and an Account Control Agreement ("ACA") between Citibank, OFN, and EPA that sets forth the specific requirements for EPA to exercise "control" as a secured party. EPA contemplated this arrangement from the program's inception—and described it in the original Notice of Funding Opportunity ("NOFO") in July 2023 as critical both to allow recipients to leverage private capital and to "ensure that EPA's interests are protected." NOFO at 58. EPA designed, structured, and negotiated the FAA[1] and the ACA to provide transparency and accountability. The ACA includes provisions that allow EPA to take exclusive control of the funds at Citibank under certain specified conditions. Unless EPA takes exclusive control of the funds, Citibank must disburse funds to OFN at OFN's request.

9.      EPA has never attempted to exercise its right to take exclusive control of the funds through legal means—nor could it, because the preconditions for exercising that right have not occurred.

10.     Nonetheless, EPA's Administrator has made several public statements expressing hostility to the GGRF program. For instance, he stated on national television, without basis, that "the entire scheme, in my opinion, is criminal." He has also publicly stated that EPA is "not going to rest" until it has "recovered" those funds. On March 4, 2025, he publicly stated that the "money is now FROZEN." EPA has also undertaken behind-the-scenes efforts to cause Citibank to withhold OFN's funds. These efforts resulted in the public resignation of the Chief of the Criminal

---

[1] Pursuant to the March 12, 2025, sealing order in *Climate United Fund v. Citibank, N.A.* ("*Climate United*"), No. 25-cv-698-TSC, OFN quotes only those portions of the FAA quoted in Citibank's publicly filed opposition to Climate United's motion for a temporary restraining order in that case. The FAA is available at *Climate United*, Dkt. No. 14.

Division of the D.C. U.S. Attorney's Office following her refusal to carry out an illegal directive to send a letter to Citibank demanding that it freeze GGRF funds.

11.    These efforts eventually worked, as Citibank now refuses to honor OFN's disbursement requests, despite Citibank's unambiguous contractual obligation to do so. On February 26, 2025, OFN sent a request for Citibank to transfer a portion of OFN's funds from one of its Citibank accounts to another. Citibank did not do so. On February 28, 2025, OFN sent a follow-up email to Citibank inquiring, among other things, into the status of the transfer and noting that OFN would shortly submit a request to draw funds from its account. Again, Citibank did not complete the transfer. On March 3, 2025, OFN instructed Citibank to draw funds from its account. Citibank did not follow OFN's instructions, and OFN was prevented from accessing its own grant funds.

12.    Since March 3, 2025, Citibank has refused OFN access to any of its grant funds. Since then, EPA also has failed to provide additional information about the status of OFN's funding with OFN.

13.    On March 11, 2025, OFN received a purported Notice of Termination ("Notice") letter from EPA Acting Deputy Administrator W.C. McIntosh stating that "effective immediately," "the Agency is terminating [the Grant Agreement] awarded to Opportunity Finance Network." Notice at 1. This purported termination was sent to all recipients of CCIA and NCIF grant awards, with no substantive differences in the stated bases for the termination.

14.    In fact, EPA has no legal basis for causing Citibank to deny OFN's disbursement requests or for terminating OFN's grant award. Under the Administrative Procedure Act ("APA"), EPA's de facto suspension and purported termination of OFN's grant is arbitrary, capricious, and not in accordance with law.

15.     Citibank likewise has no legal basis for its actions. The ACA does not allow Citibank to withhold OFN's grant funds—nor permit it to allow EPA to claw back funds—unless and until EPA has given notice that it intends to exercise exclusive control over the accounts. EPA has not done so and cannot possibly do so because there is no legal justification for such an action. The FAA, to which OFN is not a party, only permits Citibank to freeze assets "in accordance with the [ACAs]," FAA Ex. A § I.B.4, and only in response to "lawful instructions or directions" from Treasury, FAA § 5.A. But Citibank did not freeze OFN's funds "in accordance with" the ACA, and Citibank did not receive any "lawful instructions or directions" from Treasury to freeze OFN's funds.

16.     By failing to disburse OFN's grant funds, Citibank is in breach of the ACA and has wrongfully withheld the grant funds that OFN has an immediate legal right to possess.

17.     Defendants' unlawful actions are causing OFN to suffer real and immediate harm. OFN's other sources of funding are insufficient to replace the CCIA grant funds that it can no longer access. OFN has already paused virtually all contracted support for its CCIA initiatives, significantly curtailed program implementation, and paused its signature training program. More than half of OFN's 81 staff support the CCIA grant and rely on the grant to pay at least some portion of their salaries. Unless access to grant funding is restored soon, OFN will be forced to lay off staff to manage its operating deficit. In addition, OFN has been unable to award over $228 million to entities it has already selected to receive subawards to carry out CCIA projects, and it has already lost valuable funding opportunities, including $125 million worth of investments in rural American communities. OFN's inability to honor commitments and serve as a stable partner will erode trust in OFN as an institution, damage its reputation, and prevent it from fulfilling both its mission under the CCIA and its initiatives outside of the CCIA, causing OFN profound harm.

It will also cause profound harm to the organizations that rely on OFN funds to develop critical projects that reduce energy costs, create jobs, and strengthen communities.

18.    As in the consolidated CCIA Litigation and NCIF Litigation, EPA's wrongful termination should be enjoined as to OFN, and OFN's access to its grant funds held at Citibank should be restored. The Court should further direct Citibank to adhere to its contractual obligations and bar EPA from interfering with Citibank's disbursements.

19.    For the reasons outlined in this Court's recent opinion granting a preliminary injunction in *Climate United*, this Court should likewise enjoin Defendants from unlawfully denying OFN access to its grant funds.

## JURISDICTION AND VENUE

20.    This is an action for declaratory and injunctive relief based on EPA's violation of the Administrative Procedure Act, federal regulations and statutes, and the Due Process Clause. This action also seeks declaratory and injunctive relief against Citibank based on its breach of contract, conversion, and replevin.

21.    The Court has jurisdiction over OFN's claims against Defendants EPA and Zeldin under 28 U.S.C. § 1331 and 5 U.S.C. § 706. *See Climate United PI Decision* at 16-26.

22.    The Court has jurisdiction over OFN's claims against Citibank under 28 U.S.C. § 1367, because those claims are so related to OFN's claims against EPA that they are part of the same case or controversy.[2]

---

[2] Even if EPA was not named as a defendant, the Court would have jurisdiction over OFN's claims against Citibank under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

23.     Venue is proper in this district because EPA is located in this district and a substantial part of the acts or omissions giving rise to the claim occurred in this district. 28 U.S.C. § 1391(e).

## PARTIES

24.     The Opportunity Finance Network is a nonprofit organization incorporated in the Commonwealth of Pennsylvania. OFN is a leading national network of more than 470 Community Development Financial Institutions and mission-driven community lenders nationwide, and a financial intermediary whose mission is to increase capital flow, strengthen CDFIs, and amplify the voice of the CDFI industry. OFN works to ensure communities underserved by mainstream finance have access to affordable, responsible financial products and services.

25.     Defendant Citibank, N.A. is a national banking association organized and existing under the laws of the United States of America, with headquarters in South Dakota. Citibank is the wholly owned subsidiary of Citigroup, Inc., headquartered in New York.

26.     Defendant EPA is the agency of the federal government of the United States responsible for administering the GGRF and its constituent NCIF program. EPA is an agency within the meaning of the APA.

27.     Defendant Lee Zeldin is the EPA Administrator and the agency's highest ranking official. OFN sues Administrator Zeldin in his official capacity.

## BACKGROUND

### A.     Congress Establishes the CCIA Program.

28.     In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act ("IRA"). Pub. L. No. 117-169, 136 Stat. 1818. The Act amended the Clean Air Act to authorize the EPA to make competitive grants under the Greenhouse Gas Reduction Fund to

provide financial assistance for "the rapid deployment of low- and zero-emission products, technologies, and services." 42 U.S.C. § 7434. In total, the IRA appropriated $27 billion to invest in clean energy in communities across the county. *About the Greenhouse Gas Reduction Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund (last updated Feb. 13, 2025).

29.     The statute created this new program to leverage public funds with private capital and catalyze investment into places and projects that support local economic development, much like other government programs such as Small Business Administration loan guarantees, New Market Tax Credits, and Opportunity Zones.

30.     Section 134(a)(3) of the Act appropriated to the EPA Administrator $8 billion to "make grants, on a competitive basis …, to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b)." *Id.* § 7434(a)(3).

31.     In turn, subsection (b) provides that an eligible recipient shall use the grant in accordance with the following: (1) facilitating "financial assistance to qualified projects at the national, regional, State, and local levels"; (2) prioritizing "investment in qualified projects that would otherwise lack access to financing"; (3) "retain[ing], manag[ing], recycl[ing], and monetiz[ing] all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability"; and (4) providing "funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects." *Id.* § 7434(b).

9

32.     Eligible recipients are defined to include nonprofit organizations that are "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services," that do not "take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this section," that are "funded by public or charitable contributions," and that "invest[ ] in or finance[ ] projects alone or in conjunction with other investors." *Id.* § 7434(c)(1).

33.     Qualified projects are defined to include any "project, activity, or technology" that either "reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector," or "assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution." *Id.* § 7434(c)(3).

34.     In July 2023, EPA launched three grant competitions: CCIA, NCIF, and Solar for All. The $6 billion CCIA competition focuses entirely on "financ[ing] clean technology deployment in low-income and disadvantaged communities while simultaneously building the capacity of community lenders that serve those communities." NOFO at 3.

35.     The purpose of the CCIA competition was to provide grants to 2-7 hub nonprofits that, in turn, provide financing and technical assistance to specific industry networks of public, quasi-public, and nonprofit community lenders, supporting the goal that every community in the country have access to the capital needed to deploy clean technology projects in their homes, small businesses, schools, and community institutions. NOFO at 4.

36.     CCIA recipients are nonprofit organizations that award grants to numerous community lenders across the country that operate in low-income and disadvantaged communities.

37.     The Inflation Reduction Act provided that the EPA Administrator could award grants "on a competitive basis" until September 30, 2024. 42 U.S.C. § 7434(a)(1)-(3).

**B.     OFN Is Awarded CCIA Grant Funding.**

38.     On July 14, 2023, EPA issued a Notice of Funding Opportunity for the CCIA. The NOFO included "a robust set of application requirements and corresponding evaluation criteria that were used to assess materials submitted to meet those application requirements.[3] "Application requirements covered a diverse set of topics and included not just a detailed project narrative but also a robust set of application attachments," such as "organizational and governing documents; resumes of board members and senior management; legal and compliance risk management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives."[4]

39.     EPA established a rigorous process to review and select applications. That process included an evaluation of each applicant's program plan, organizational capacity, previous experience managing third-party capital, and experience managing financial, credit, compliance, and other risks. The review was conducted by expert panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official authorized to make the final selection for awards. NOFO at 55.

40.     OFN was formed more than 40 years ago to empower mission-driven community lenders. OFN seeks to use its CCIA award to finance projects in housing, transportation, energy infrastructure, and other initiatives across the United States. It seeks to do so consistent with its

---

[3] *See also* Greenhouse Gas Reduction Fund, Review and Selection Process, EPA (last updated Aug. 16, 2024), https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process.
[4] *Id.*

mission to ensure communities underserved by mainstream finance have access to affordable, responsible financial products and services, and to carry out Congress' directive to invest in communities across America to create jobs and protect the environment.

41.    On October 10, 2023, OFN applied to the CCIA grant competition with a $3.2 billion proposal. As part of the application process, OFN was required to submit a detailed budget to EPA. Additionally, prior to receiving the Notice of Award, OFN was required to attach a negotiated, thoroughly reviewed, and approved budget to its grant agreement with EPA.

42.    Following EPA's lengthy and rigorous review process, OFN was awarded $2.29 billion in CCIA grant funding. The award was announced in April 2024, in a press release touting OFN's credentials and vision.[5]

43.    Consistent with the purpose of the Inflation Reduction Act under which the CCIA funds were appropriated, OFN developed and EPA approved a workplan that was finalized with the award and posted publicly for full transparency. As enumerated in the workplan, OFN plans to obligate at least $207 million in subawards in the first year of funding (*i.e.*, before July 2025) that will to be invested in qualified projects, and will draw upon the full $2.3 billion over the first six years of the program. OFN has received and reviewed applications from a significant number of community lenders and finalized its internal approval of initial subawards to 26 subrecipients totaling more than $228 million. Without access to its CCIA award funds, OFN cannot distribute that funding, and due to the freeze by Citibank, OFN cannot set up the subaward accounts for the 26 subrecipients.

---

[5] Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America, EPA (last updated Aug. 16, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and.

C.     **The Terms and Conditions of the Grant, Including Suspending or Terminating the Grant.**

44.     The award was memorialized in a final grant agreement, known formally as a Notice of Award ("NOA"). The original NOA was dated August 8, 2024 (hereinafter "August NOA"). That NOA was then updated on December 12, 2024 (hereinafter "December NOA").[6] The December NOA sets forth the operative Terms and Conditions for OFN's award. The operative Terms and Conditions of OFN's grant are the same as for the other CCIA and NCIF grantees.

45.     The December NOA required OFN to adhere to a rigorous set of reporting requirements. These include requirements to produce semi-annual, annual, and final reports to EPA with "detailed narratives describing program performance … supported with qualitative discussions and quantitative metrics," December NOA at 15, submit semi-annual transaction-level and project-level data reports, *id*. at 17, and provide ongoing disclosures to EPA, *id*. at 17-18.

46.     The Terms and Conditions provide that OFN "must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days." *Id*. at 59.

47.     In addition, the Terms and Conditions required OFN (as well as other GGRF recipients) to complete standard EPA grants training within 90 days of receipt of the grant, including the "*EPA Grants Management Training for Applicants and Recipients*" and "*How to*

---

[6] The December NOA is substantially similar to the August NOA. The changes primarily reflected the insights gained over time, but the December NOA did not alter the overall grant award or the underlying reporting and transparency requirements. However, the December NOA updated certain Terms and Conditions governing the grant. As relevant here, the December NOA updated the Terms and Conditions to account for Citigroup being selected by the Treasury Department to serve as its financial agent; clarified the definitions of "Waste, Fraud, and Abuse" and "Materially Impaired"; clarified which versions of the applicable regulations govern termination of the grant; and specified certain procedures involved in issuing notices about the grant funds to financial institutions. *Compare* August NOA and December NOA.

*Develop a Budget*." *Id*. at 5. OFN complied with this requirement, even though OFN had already submitted a detailed budget to EPA in connection with the grant competition selection process, and had already attached a negotiated, reviewed, and approved budget to its grant agreement before receiving the Notice of Award.

48.     Like with other CCIA and NCIF grants, the Terms and Conditions of OFN's grant constrain EPA's ability to unilaterally suspend the award or prevent OFN from accessing its funds. *See Climate United PI Decision* at 4-6. Instead, the Terms and Conditions specify that EPA can suspend or terminate OFN's CCIA funds in three (and only three) scenarios. December NOA at 43.

   a. *First*, EPA may terminate the Agreement if OFN engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." *Id.* Effective performance is "Materially Impaired" if (1) EPA issues a "written determination and finding … that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause" and, (2) if EPA determines in its sole discretion that a "corrective action plan" would remedy the issue, EPA must issue a "separate written determination and finding" that the Recipient "has not materially addressed its failure." *Id.* at 10.

   b. *Second*, EPA may terminate the Agreement if OFN engages in "material misrepresentation of eligibility status." *Id.* at 43.

   c. *Third*, EPA may terminate the Agreement for "Waste, Fraud, or Abuse," *id.*, which is defined with reference to the EPA General Terms and Conditions and 2 C.F.R. § 200.113, *id.* at 14. Those sources require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or

gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. §§ 3729-3733)." *See* EPA, *General Terms and Conditions* (effective Oct. 1, 2024), https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf; 2 C.F.R. § 200.113.

49.     In addition, EPA is obligated by regulation to take certain procedural steps to terminate the grant agreement. Among other things, EPA must comply with 2 C.F.R. § 200.341, which requires EPA to provide written notice of termination to the recipient that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341; December NOA at 43 (incorporating this regulatory requirement into the Terms and Conditions).

50.     The Terms and Conditions may not be unilaterally modified by either party. Rather "[t]he EPA Award Official and Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding." December NOA at 54.

**D.    The Account Control Agreement Between OFN, EPA, and Citibank.**

51.     The grant agreement required OFN to enter into an Account Control Agreement. OFN entered into the ACA with EPA and Citibank on November 1, 2024. OFN's ACA is essentially identical to the ACAs that Citibank entered into with other CCIA and NCIF grantees. *See Climate United PI Decision* at 6-8.

52.     Under the ACA, Citibank administers the funds provided under the CCIA, in its role "as a financial agent of the United States pursuant to the authority" of Treasury, and EPA serves as the "Secured Party." ACA at 2.

53.     The ACA specifies that Citibank's duties with respect to the funding are exclusively "administrative or ministerial (and shall not be construed as fiduciary in nature)." ACA at 3. The ACA further specifies that Citibank "shall not be responsible for any of the agreements referred to or described herein (including, without limitation, the Grant Agreement …), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby." *Id.*

54.     Citibank is required to disburse funds to OFN upon OFN's request. ACA § 2 provides that Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts."

55.     The only circumstance contemplated by the ACA under which Citibank could refuse to disburse funds as directed by OFN is if EPA exercises its "right of control" under the ACA. *Id.* at 2.

56.     To exercise its right of control, EPA must notify Citibank of its intention to exercise exclusive control over the accounts, in a form substantially similar to a sample Notice of Exclusive Control contained in the ACA. *Id.*; *see also id.* at 2 (stating that OFN and EPA "have agreed that the terms and conditions entitled 'Deposit Account at Financial Agent' in the Grant Agreement indicate the conditions under which the [EPA] may exercise its right of control").

57.     The form Notice of Exclusive Control states: "As required by the Grant Agreement, the Secured Party [*i.e.*, EPA] has issued a written determination and finding that Pledgor [*i.e.*,

OFN] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse (as defined in the Grant Agreement) or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement." *Id*. at 10.

58.    The form NOEC thus incorporates the standard for termination of the award specified under the Terms and Conditions. *Compare id.*, with December NOA at 43 (discussing termination under the "programmatic conditions" header).

**E.    The Financial Agency Agreement Between Citibank and Treasury.**

59.    The July 2023 NOFO envisioned entering into a "financial agent arrangements with the U.S. Department of Treasury" to "ensure that EPA's interests are protected." NOFO at 58. OFN had no role in EPA's decision to include the financial agent concept in the July 2023 NOFO.

60.    The Financial Agent concept is an established mechanism for disbursing government funding that was first authorized in the 1860s and has been used for decades.[7]

61.    After a selection process run by Treasury, Citibank was selected as the Financial Agent. Citibank and Treasury entered into the FAA on September 19, 2024.

62.    Like other CCIA and NCIF grantees, OFN is not a party to the FAA. Nor did OFN have a role in selecting the financial agent.

---

[7] Revenue Collections And Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency, GAO-17-176 (Jan. 2017), https://www.gao.gov/assets/gao-17-176.pdf ("Treasury has a long history of using financial agents to support its core functions of disbursing payments and collecting revenue.").

63.     The financial agent arrangement provides EPA with full transparency into how grant funds are being spent. EPA has full, real-time view access into all accounts of OFN. The financial agent arrangement also provides EPA with full visibility into any program income generated by OFN, which is typically opaque to EPA under alternative financial arrangements, including the Automated Standard Application for Payments ("ASAP") system.[8]

64.     The FAA states that Citibank will provide "commercial banking and finance services" "related to programs under the Inflation Reduction Act … including … grant programs" such as the CCIA. The FAA is not specific to OFN's award and OFN is not mentioned in the FAA.

65.     The FAA states that Citibank "owes a fiduciary duty of loyalty and fair dealing to the United States when acting as a financial agent of the United States." The FAA further provides that as a financial agent, Citibank will "construe the terms of this FAA and any related instructions from Treasury in a reasonable manner" and commits "to act only within the scope of its actual authority and to comply with all lawful instructions or directions received from Treasury."

66.     The FAA authorizes Citibank to "freeze accounts, and transfer funds in frozen accounts, at the direction of the relevant secured party [*i.e.*, EPA]," but specifies that any such action must be "in accordance with the account control agreements." Thus, nothing in the FAA authorizes Citibank to freeze or transfer OFN's award money absent a valid "Notice of Exclusive Control" under the ACA.

---

[8] From August 2024 (when the August NOA was finalized) until November 2024 (when the ACA was finalized), OFN's grant was administered under the ASAP system. After that point, it was administered under the FAA with Citibank. EPA has traditionally used the ASAP system to disburse grant award funds. Under the ASAP system, Treasury does not conduct oversight—it simply reports to EPA the amounts that have been drawn by the recipient and what amounts remain. *See Revenue Collections and Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency*, GAO-17-176 (Jan. 2017), https://www.gao.gov/assets/gao-17-176.pdf ("Treasury has a long history of using financial agents to support its core functions of disbursing payments and collecting revenue.").

**F.      OFN Uses Grant Funds Provided by Citibank in the Normal Course.**

67.      OFN's CCIA funds were fully obligated by EPA on August 8, 2024.

68.      OFN has drawn money from its Citibank accounts to pay operating expenses, as permitted by the governing Terms and Conditions (and underlying statutes and regulations), which requires prior approval for drawing of transfers that will not be disbursed in the following fourteen business days. *See* December NOA at 60-61.

69.      OFN has used grant funds for eligible payments to contractors hired consistent with federal procurement rules, and part of the salaries and benefits for 42 employees on its payroll.

70.      OFN plans to use awards to finance projects to benefit under-resourced communities. Thus far, OFN has launched a pilot "Nascent Climate Lender Training" program to build its pipeline of qualified CDFI lenders, and it has already engaged in months-long trainings with 36 lenders. As explained, OFN approved awards to 26 community lenders. The announcement of over $228 million in initial awards to finance housing, distributed energy, and develop transportation infrastructure projects in more than 30 states, creating or retaining an estimated 5,000 jobs in communities across the United States, has been paused due to the illegal actions of the Defendants.

71.      Throughout this period, EPA has continued to exercise its oversight and supervisory authority provided for under the grant award's Terms and Conditions (and underlying statutes and regulations).

**G.      EPA Takes Actions to Suspend or Terminate OFN's Grant, And to Cause Citibank to Withhold OFN's Funds.**

72.      On January 30, 2025, Administrator Zeldin was sworn in as the EPA Administrator.

73.    On February 12, 2025, Administrator Zeldin made a public statement announcing EPA's goal of taking possession of grant funds disbursed pursuant to the Inflation Reduction Act.[9] Without mentioning any specific basis for adverse action under the terms of OFN's award—or that of any other recipient—Administrator Zeldin stated that "the financial agent agreement with the Bank needs to be instantly terminated," and stated that "the Bank must immediately return" the grant funds.[10] To ensure EPA "reassume[s] responsibility for all of these funds," Administrator Zeldin then stated that he would "refer[] this matter to the Inspector General's Office and will work with the Justice Department," and that EPA is "not going to rest" until it has "recover[ed]" the grant funds.[11]

74.    According to public news reporting, which EPA and DOJ have not disputed when given the opportunity in court, EPA thereafter took multiple actions designed to suspend or terminate OFN's grant, and cause Citibank to withhold grant funds from OFN. Those actions include, but are not limited to:

    a.    On February 17, 2025, the Office of the Deputy Attorney General ("ODAG") at the Department of Justice communicated with the United States Attorney's Office in Washington, D.C. ("USAO-DC"), seeking to open a grand jury investigation into GGRF grants awarded by EPA.[12] Denise Cheung, the Chief of the Criminal

---

[9] Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM), https://x.com/epaleezeldin/status/1889840040622321778.

[10] *Id*. at 2:15.

[11] Rapid Response 47 (@RapidResponse47), X (Feb. 25, 2025, 10:16 AM), https://x.com/RapidResponse47/status/1894406216052289869.

[12] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/; *see also* Kyle Cheney, et al., *Senior Prosecutor in Washington Quits, Citing Pressure to Probe Biden-era Climate Funds*, Politico (Feb. 18, 2025), https://www.politico.com/news/2025/02/18/denise-cheung-us-attorneys-office-washington-020363.

Division at USAO-DC, advised that there was not an adequate factual basis to open that grand jury investigation.[13]

b.  On February 17, 2025, FBI "recommended" that Citibank freeze assets in the accounts of OFN and every other prime recipient of a GGRF grant.[14] In that letter, FBI did not refer to the FAA between Citibank and Treasury, or any obligations under the FAA. FBI never produced a warrant issued by a judge who found probable cause based on a sworn affidavit. FBI never articulated any exigent circumstances to justify an immediate seizure of OFN's assets without notice to OFN. FBI never identified any substantive factual basis for its "recommendation." And FBI took this action even though Ms. Cheung advised that there was not "sufficient evidence to tell the bank that there is probable cause to seize the particular accounts identified."[15]

c.  That same day, the ODAG instructed that a second letter be sent to Citibank directing that Citibank implement an asset freeze and refrain from releasing funds in the accounts of 28 other GGRF awardees and subawardees pursuant to a criminal investigation.[16] In response, senior officials at the DC-USAO again asserted there was not sufficient evidence to justify issuing that letter.[17] Consistent with her oath

---

[13] *Resignation Letter*, *supra* note 13 (noting assessment that no "predicate for opening such a grand jury investigation existed" on the face of the existing documents provided by ODAG).

[14] *See* Exhibit 5 to Citibank's TRO Opposition, *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698-TSC (D.D.C. Mar. 12, 2025), Dkt. No. 14-5.

[15] *Resignation Letter*, supra note 13.

[16] *Id.*

[17] *Id.*

of office, Ms. Cheung refused to send the letter and was forced to resign on February 18, 2025.[18]

d.  Apparently without signoff from other prosecutors at the DC-USAO, Interim U.S. Attorney Ed Martin submitted a seizure warrant application with a magistrate judge, which was rejected.[19] After that, ODAG reportedly sought a different U.S. attorney's office to carry out the warrant request in order to launch a grand jury investigation and obtain a court-ordered bank freeze, but prosecutors in that office likewise refused to do so.[20]

e.  On February 19, 2025, Administrator Zeldin stated on X that he had "just read" a "grant agreement" related to the GGRF, characterizing it as "wild."[21]

f.  On February 22, 2025, and at other times thereafter, Administrator Zeldin has stated that he has cancelled several grant agreements, apparently unilaterally, regarding climate and the environment.[22]

---

[18] *Id.*

[19] Spencer Hsu, Maxine Joselow & Nicolas Rivero, *FBI Takes Up EPA Probe Amid Pushback from Judge, Prosecutors*, Wash. Post (Feb. 27, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/.

[20] *Id.*

[21] Lee Zeldin (@EPALeeZeldin), X (Feb. 19, 2025, 4:01 PM), https://x.com/epaleezeldin/status/1892318587961930086.

[22] Lee Zeldin (@EPALeeZeldin), X (Feb. 22, 2025, 2:10 PM), https://x.com/epaleezeldin/status/1893377875220332772 (proclaiming EPA has "cancelled" various "DEI and environmental justice grants and contracts"); *see also* Lee Zeldin (@EPALeeZeldin), X (Feb. 28, 2025, 5:40 PM), https://x.com/epaleezeldin/status/1895604975860125829.

g.  On February 23, 2025, Administrator Zeldin discussed the GGRF program on national television and stated, without basis, that "the entire scheme, in my opinion, is criminal."[23]

h.  On March 2, 2025, EPA Deputy Administrator W.C. McIntosh sent a letter to EPA's Office of the Inspector General asking for an OIG investigation into GGRF funding.[24] That letter, which was public, stated that Citibank was withholding the funds "voluntarily." The letter did not disclose FBI's "recommendation" to freeze the funds or EPA's role in procuring that "recommendation."

i.  EPA then emailed a copy of that letter to Citibank, asserting that the letter "highlights several of the egregious instances of misconduct regarding $20 billion GGRF distributions that have been improperly funneled through your financial institution," and stating that "EPA will continue our efforts to re-establish accountability and oversight over the GGRF, which is riddled with self-dealing, conflicts of interest, extraordinarily unqualified recipients, improperly reduced government oversight, and much more."[25] But the email to Citibank contained no actual factual basis for its assertions with respect to OFN (or any other CCIA or NCIF grantee).

---

[23] Sunday Morning Futures (@SundayMorningFutures), X (Feb. 23, 2025, 11:21 AM), https://x.com/SundayFutures/status/1893697750937505807; *see also* Zack Colman, *Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate Grants*, Politico (Feb. 24, 2025), https://www.politico.com/news/2025/02/24/climate-grant-recipient-spending-trumps-epa-tries-claw-back-00205814 (collecting quotes).

[24] EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General, EPA (last updated Mar. 3, 2025), https://www.epa.gov/newsreleases/epa-formally-refers-financial-mismanagement-20b-gold-bars-inspector-general.

[25] *Climate United*, Dkt. No. 14-6 (Exhibit 6 to Citibank's opposition to Plaintiff's Motion for a TRO).

j.  On March 4, 2025, the Department of Treasury directed Citibank not to disburse funds from any of the GGRF accounts for a specified period. In an email to Citibank at 10:02 PM, Treasury stated that "Treasury is instructing Citibank, in its capacity as fiduciary, to work directly with the EPA to establish and implement reasonable account controls to serve the purposes and interests of the United States, in accordance with Section 5 of the FAA. Further, in order to provide the EPA with the necessary time to develop reasonable account controls, we are further instructing Citibank not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025."[26]

k.  On March 4, 2025, Administrator Zeldin stated: "The money is now FROZEN and DOJ/FBI is investigating."[27]

l.  On March 10, 2025, in an email to Citibank, EPA directed Citibank to continue to refrain from processing payments. That message stated: "In its communication to the Bank this week, the U.S. Department of the Treasury (Treasury) directed the Bank to cooperate with EPA on account controls. To prevent the misuse of funds in the interim, EPA instructs the Bank, pursuant to this Treasury directive, the grant agreements, and Section I.B of Exhibit A to the [FAA], to pause the processing of payment instructions for the GGRF accounts until further notice."[28]

---

[26] *Climate United*, Dkt. No. 14-7 (Exhibit 7 to Citibank's opposition to Plaintiff's Motion for a TRO).

[27] Lee Zeldin (@EPALeeZeldin), X (Mar. 4, 2025, 6:02 PM), https://x.com/epaleezeldin/status/1897060177784004921.

[28] *Climate United*, Dkt. No. 14-2 (Exhibit 2 to Citibank's opposition to Plaintiff's Motion for a TRO).

75. EPA has not issued a Notice of Exclusive Control—which is the legal tool described in the ACA for restricting OFN's access to these funds.

76. Citibank has failed to comply with OFN's normal-course requests for disbursements, as required by the ACA, and has failed to provide OFN with any valid legal basis for its failure to act.

    a. On February 26, 2025, OFN placed a request to Citibank to transfer CCIA funds between its Citibank accounts—in this instance, from its Technical Assistance Services Budget account to its Program Administration Activities Budget account. Citibank did not effectuate that transfer.

    b. On February 28, 2025, OFN sent an email to Citibank notifying them of a forthcoming request to draw funds from OFN's account and requesting a status update regarding the prior request to transfer funds between accounts. Again, Citibank did not effectuate the transfer.

    c. On March 3, 2025, OFN placed the request to Citibank to draw funds from its account. In the normal course, Citibank would have sold shares in OFN's money market account and then distributed the resulting funds to OFN later that same day. But OFN's account with Citibank does not reflect that the typical money market transaction or disbursement occurred, and OFN did not receive any funds from its account. That day, Citibank also informed OFN that the transfer had not been processed. Instead, Citibank instructed OFN to "continue to reach out to the EPA."

    d. On March 4, 2025, in "a statement emailed to *Newsweek*…, a spokesperson for Citibank said Citi has been working with federal officials to 'address government officials' concerns' regarding the GGRF. 'Our role as financial agent does not

involve any discretion over which organizations receive grant funds,' the bank said in its statement. 'Citi will of course comply with any binding instructions from the federal government.'"[29]

    e. To date, OFN has not received access to its CCIA grant funds.

77.    EPA failed to provide OFN with a reasoned explanation for its actions or a meaningful opportunity to object or to be heard prior to the notice purporting to terminate its grant. EPA never informed OFN prior to attempting to terminate its grant that EPA had been trying to freeze or suspend OFN's grant or its access to grant funds, or that EPA had directed Citibank to stop disbursing funds to OFN.

    a. On February 14, 2025, OFN sent a letter to Administrator Zeldin requesting a meeting to discuss OFN's work and its CCIA grant. OFN was informed by the EPA Chief of Staff that the request had been sent to the Administrator's schedulers for calendaring. OFN followed up on its request on February 25, 2025. EPA did not respond.

    b. On March 11, 2025, EPA purported to terminate OFN's CCIA grant. EPA submitted a purported Notice of Termination to OFN which contained no information specific to OFN's performance under the grant agreement and was materially identical to the termination notices sent to every other CCIA and NCIF grantee.

    c. On March 21, 2025, OFN attended a recurring bi-weekly meeting with EPA staff. EPA stated that it is not able to address the litigation or the termination status of the

---

[29] Jeff Young, *Green Group Wants EPA to Explain Why $20 Billion Accounts Are Frozen*, Newsweek (Mar. 4, 2025), https://www.newsweek.com/climate-united-fund-epa-letter-frozen-bank-accounts-2039608.

grants. On March 24, after further inquiries from OFN, EPA stated that EPA "does expect OFN to continue meeting the obligations under the Grant Agreement. We have no information about accessibility of funds."

d.  On March 28, 2025, OFN emailed Deputy Administrator McIntosh requesting a meeting to discuss the grant award. Again, EPA did not respond.

e.  On April 10, 2025, solely to preserve its rights and without conceding the validity of the EPA's purported notice of termination, OFN emailed Deputy Administrator McIntosh and their Program Officer a notice challenging and appealing any purported termination of their CCIA grant.

## H.    EPA sends a Purported "Notice of Termination"

78.    On March 11, 2025, EPA sent OFN a purported "Notice of Termination" ("Notice"). That Notice is materially identical to the notices that EPA sent to at least two other CCIA awardees that have already brought suit in this court in the CCIA Litigation.[30] It is also materially identical to the notices EPA sent to the three NCIF recipients that are at issue in the NCIF Litigation.[31] Like with the termination notices sent to other CCIA and NCIF grantees, the Notice provided no individualized reasoning as to anything OFN itself did—instead referencing generalized and unsubstantiated reasons for termination. *See Climate United PI Decision* at 28.

79.    The Notice states that EPA is terminating OFN's award "[p]ursuant to [EPA's] authority under 2 C.F.R. §[ ] 200.339." Notice at 1. That regulation only applies when "the

---

[30] *See Justice Climate Fund v. Citibank, NA.*, No. 25-cv-938 (filed Mar. 31, 2025); *Inclusiv, Inc. v. EPA*, No. 25-cv-948 (filed Mar. 31, 2025)

[31] *See Climate United Fund v. Citibank, NA. ,* No. 25-cv-698-TSC (filed Mar. 8, 2025); *Coalition for Green Capital v. Citibank, NA.,* No. 25-cv-735-TSC (filed Mar. 12, 2025); *Power Forward Communities, Inc. v. Citibank, NA.,* No. 25-cv-762-TSC (filed Mar. 14, 2025); and *California Infrastructure and Economic Development Bank v. Citibank, NA.,* No. 25-cv-820 (filed March 19, 2025).

recipient … fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." But EPA's Notice does not offer any explanation as to how OFN violated any constitutional provision, statute, regulation, term, or condition of the grant, let alone provide any evidence that might substantiate such an allegation.

80.    The Notice also states that EPA is terminating OFN's award "[p]ursuant to [EPA's] authority under … 2 C.F.R. §§ 200.340." Notice at 1. That regulation is the only termination authority mentioned in EPA's General Terms and Conditions for grants, permits termination "[b]y the Federal agency … if the recipient … fails to comply with the terms and conditions of the Federal award" or "[b]y the Federal agency … pursuant to the terms and conditions of the Federal award." 2 C.F.R. § 200.340(a)(1) and (4). EPA's Notice does not offer any explanation as to how OFN has failed to comply with any Terms and Conditions of its grant, let alone any evidence that might substantiate such an allegation.

81.    The Notice also states that EPA is terminating OFN's award "[p]ursuant to [EPA's] authority under … the terms and conditions of the Grant Agreement." *Id*. The Grant Agreement specifies that termination may only occur if one of three conditions is met: (1) noncompliance with the grant's Terms and Conditions; (2) "adequate evidence of Waste, Fraud, or Abuse," which in turn requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the united States Code or a violation of the civil False Claims Act"; and (3) "material misrepresentation of eligibility status." December NOA at 43. EPA's Notice does not say which of these conditions has been met, provide any explanation as to how OFN has violated the terms or conditions of the grant, or offer any evidence to substantiate any allegation.

28

82.     The Notice also states that EPA is terminating OFN's award "[p]ursuant to … the Agency's inherent authority to reconsider prior determinations in light of new information." Notice at 1. EPA's Notice does not identify the source of such inherent authority or any new information to support reconsidering the prior determination to award the grant to OFN less than one year ago.

83.     The Notice also states that the "termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award." *Id*. EPA's Notice does not identify any legal or factual basis for terminating the grant on these grounds.

84.     The Notice also states that EPA has identified certain deficiencies, such as "the absence of adequate oversight and account controls," "allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and the "circumvention and defeat of key oversight mechanisms." *Id*. EPA's Notice does not substantiate these concerns or identify any legal or factual basis for terminating the grant on these grounds.

85.     Finally, the Notice asserts that EPA has "determined that its existing process for awarding and overseeing execution of the Grant Agreement" may violate the "Appointments Clause and private nondelegation doctrine." *Id*. at 2. EPA's Notice does not explain any legal or factual basis for terminating the grant on these grounds. Indeed, neither the Appointments Clause nor the private nondelegation doctrine is implicated by this grant agreement.

86.     By press release dated March 11, 2025, EPA confirmed that it had "notified the National Clean Investment Fund and Clean Communities Investment Accelerator recipients of the termination of their grant agreements."[32]

87.     EPA has failed to substantiate the basis for its terminations of GGRF grant awards despite repeated requests to do so, including from this Court. "[W]hen questioned at the March 12 hearing" in *Climate United v. Citibank*, No. 25-cv-698, EPA was unable to provide evidence to justify its termination, instead offering "circular" responses. *Id*. Dkt. 28 at 17. EPA was also directed to submit a declaration "setting forth the basis for the termination" of GGRF grants, but that declaration failed to justify EPA's actions, offering only "vague and unsubstantiated assertions" without evidence. *Id*. Dkt. 18 at 22. To date, EPA has not informed OFN that it did anything wrong.

I.     **EPA Modifies Its General Terms and Conditions to Add a New Ground for Termination, Then Rescinds Those Changes Days Later.**

88.     On March 25, EPA updated its general terms and conditions to add "a new termination provision if the award no longer effectuates the program goals or agency priorities."

89.     That new termination provision purported to permit termination, with respect to "all new awards and funding amendments (incremental and supplemental) made on or after March 25, 2025," "[b]y the EPA or pass-through entity to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

---

[32] *See* Press Release, EPA, Administrator Zeldin Terminates Eiden-Harris $20B 'Gold Bar' Grants (Mar. 11, 2025), https://www.epa.gov/newsre1eases/administrator-zeldin-tenninates-biden-harris-20b-gold-bar-grants.

90.     On Friday, March 28, 2025, EPA effectively rescinded its March 25, 2025, changes, replacing the EPA General Terms and Conditions with the version that was effective prior to March 25, 2025.

91.     On Thursday, April 3, 2025, EPA again published changes to its general terms and conditions, again adding the language allowing it to terminate an award "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." This revised version, however, is limited to "new awards and funding amendments (incremental and supplemental) made on or after April 3, 2025."

92.     Neither the termination provision temporarily added in EPA's March 25 revision nor the new termination provision in the April 3 revision is effective against OFN's CCIA award, for at least three reasons: (1) the exclusive grounds for termination are set forth in the Terms and Conditions of the Grant Agreement, December NOA at 43; (2) EPA may not unilaterally modify the Terms and Conditions of the Grant Agreement, *id.* at 54; and (3) the Grant Terms and Conditions formally incorporate EPA's General Terms and Conditions as they were on the effective date of the December NOA, which cannot be changed without OFN's consent, *see id.* at 54-55 (providing that "the EPA General Terms and Conditions effective October 1, 2024" "are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement" and are "controlling … in the event [they] are … replaced"); *see also id.* at 55 ("This provision cannot be changed without the consent of the Recipient.").

**J.      Citibank and EPA's Actions Have Harmed OFN.**

93.     The CCIA award is currently the basis of funding for a significant share of OFN's operations and for the initiatives that OFN is planning to launch. Even temporary inability to access

its funding immediately threatens OFN's operations, its ongoing and future projects, and its long-term reputation.

94.    OFN's other funding sources are insufficient to replace the CCIA award. Nor is private investment a viable replacement. In fact, OFN was specifically awarded CCIA funding to "prioritize investment in qualified projects that would otherwise lack access to financing." 42 U.S.C. § 7434(b)(1)(B).

95.    Without access to its award funds, OFN is unable to fully carry out its mission and CCIA grant obligations, which are to deploy capital to vetted community lenders to fund green projects that would not otherwise have been able to obtain financing through traditional channels.

96.    To start, Defendants' actions have seriously harmed OFN's operations and programs. Most immediately, OFN cannot access funds necessary to pay its payroll and other expenses related to the immediate implementation of its EPA-approved program workplan under OFN's CCIA grant. More than half of OFN's 81 staff members are supported by its CCIA grant. Without access to its CCIA grant funding, OFN is unable to support these staff to carry out the objectives of the CCIA program. As a result, OFN is in imminent danger of laying off staff to manage the operating deficit that Defendants have caused.

97.    As a result of Defendants' actions, OFN has also been forced to take significant steps to reduce its operating costs. In particular, OFN has paused virtually all contract support work. This reduction has undermined many of OFN's core operations, including ensuring regulatory and legal compliance and adherence to the terms of OFN's CCIA grant agreement. These disruptions have also forced OFN to shift resources and staff that would otherwise focus on non-CCIA activities that drive revenue for OFN, compounding the harm.

98.     OFN has also made significant cuts to its own program implementation. For example, OFN has paused its training initiative, the Nascent Climate Lender Training program. This program advances OFN's core mission by providing capacity building and expertise to community lenders, including those who may receive future CCIA subawards. To establish this program, OFN reviewed over 100 applications, selected 36 community lenders to participate, and commenced the program in 2025. As a result of Defendants' actions, OFN has been forced to pause the program, damaging OFN's pipeline of community lenders, impeding its ability to carry out its central mission, and harming its reputation.

99.     Critically, prior to the wrongful disruption of its CCIA grant funding, OFN was poised to award over $228 million in subawards to 26 community lenders in a pilot funding round. Without access to its CCIA funding, OFN will not be able to issue these 26 pending subawards. These awards would support approximately 84 qualified projects across 21 states, including critical housing and clean energy projects, that will not proceed unless OFN's access to its funding is restored. That not only harms OFN and potential subrecipients, but also the American people.

100.    OFN has also experienced significant disruption to its ongoing efforts to fundraise additional private capital to provide senior unsecured balance sheet loans to its selected subrecipients. OFN expected to launch a new $200 million fund to support GGRF program goals related to private capital mobilization and anticipated closing $20 million in underlying loans for this new fund on its own balance sheet in 2025. The interruption to OFN's CCIA grant has interfered with its ability to raise funds from investors and lenders for this fund, as well as its ability to extend additional loans to its selected subrecipients. As a result, OFN has reduced its debt origination projections by $20 million for 2025, causing further harm to OFN in its ability to carry out its mission.

101.    Not only has OFN been unable to award over $228 million to entities it has selected to receive subawards, but it has also lost valuable investment opportunities, including a prospective subrecipient that withdrew its application that was projected to support $125 million in housing and community facilities projects in rural America. The pause of OFN's Nascent Climate Lender Training Program has caused irreparable harm, and will continue to cause harm, to the confidence of members in OFN.  OFN asked its members to commit a significant amount of time and resources to develop their climate lending programs, and OFN was forced to pause the training prior to completing it and realizing the benefits. Further, the inconsistency of information from the EPA regarding the status of the OFN grant has prevented OFN from being able to communicate consistently with its members, causing reputational harm. The program instability is causing and will continue to cause a loss of confidence among OFN members regarding OFN's ability to manage programs. It will also decrease programmatic impact and reduce program participation. It also threatens OFN's recovery of the remaining participant support costs, which will have additional budgetary implications for OFN.

102.    OFN's resulting inability to honor its commitments to its members, prospective subrecipients, contractors, and investors will erode trust in OFN as an institution, damage its reputation, and cause profound harm to the organizations that rely on OFN funds to develop critical projects that reduce energy costs, create jobs, and strengthen communities.

103.    OFN's success depends on its reputation, including with investors and members. That trust has been built over a 40-year period through careful management of private and federal funds and diligent work building and sustaining relationships. Defendants' actions have damaged OFN's reputation and the relationships it has worked to build. OFN has been forced to notify its

investors and partners of these events. Defendants' actions have continued to impede OFN's ability to fundraise for both debt and grant investors moving forward.

**CLAIMS FOR RELIEF**

**COUNT ONE: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**ARBITRARY AND CAPRICIOUS**
**(CHALLENGE TO TERMINATION)**
**(Defendants EPA, Administrator Zeldin)**

104.    OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

105.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

106.    On March 11, 2025, EPA purported to terminate OFN's grant by delivering a "Notice of Termination."

107.    EPA's termination of OFN's grant constitutes final agency action under the APA.

108.    EPA's termination of OFN's grant is arbitrary and capricious because EPA had no legal or factual basis for the termination and EPA did not provide an adequate or reasoned basis for the termination.

     a.    The Notice states that EPA is terminating OFN's grant "[p]ursuant to [EPA's] authority under 2 C.F.R. 200.339-340, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information." But EPA's Notice does not offer any evidence or explanation to support termination on those grounds. Indeed, there is no legal or factual basis for termination on any of those grounds. OFN has not violated any constitutional

provision, statute, or regulation; has not failed to comply with any Terms or Conditions of its grant; has not failed to comply with any General Terms and Conditions of EPA assistance award agreements; has not engaged in "Waste, Fraud, or Abuse," which is defined as "the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act"; and has not triggered any of the grounds for termination under the Terms and Conditions of its grant.

b. EPA's Notice does not identify the source of any inherent authority to terminate the grant; does not identify any new information to support reconsidering the prior determination to award the grant to OFN less than one year ago; does not identify any basis to terminate the grant based on concerns about program integrity, the award, process, programmatic fraud, waste, and abuse, misalignment with the Agency's priorities, or sufficiency of oversight mechanisms or account controls; and does not explain any legal or factual basis for terminating the grant based on the Appointments Clause or the private nondelegation doctrine.

c. EPA's termination reflects an arbitrary and capricious change in position. EPA has provided no reasoned explanation for its decision to terminate OFN's grant on March 11, 2025, when the grant was awarded in April 2024, following months of rigorous review as part of a competitive application process.

d. EPA's Notice did not provide a theory underlying the termination. To the contrary, the termination notice was sent just seven days after EPA requested information so that EPA could evaluate the GGRF program's oversight controls, and gave OFN

and other grantees until March 28, 2025 to respond. It is therefore unclear what relevant data EPA considered within such a short period that called for the sudden termination of the grants.

e.  EPA's Notice provides no explanation for its abrupt change of position that accounts for upsetting the reliance interests of OFN and its subgrantees.

109.    OFN is entitled to an injunction against EPA's wrongful action.

110.    Pursuant to 28 U.S.C. § 2201, OFN is entitled to a declaration that EPA's termination is arbitrary and capricious, in violation of the APA.

**COUNT TWO: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
NOT IN ACCORDANCE WITH FEDERAL REGULATIONS
(CHALLENGE TO TERMINATION)
(Defendants EPA, Administrator Zeldin)**

111.    OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

112.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

113.    On March 11, 2025, EPA purported to terminate OFN's grant by delivering a Notice of Termination.

114.    EPA's termination of OFN's grant constitutes final agency action under the APA.

115.    EPA's termination of OFN's grant is not in accordance with law because it violates multiple federal regulations. For example:

a.  EPA's termination of the grant violates EPA regulations and Uniform Grant Guidance regulations codified at 2 C.F.R. § 200 *et seq.,* which do not allow EPA to terminate OFN's grant under these circumstances.

37

b.  EPA's termination of the grant has not complied with EPA's regulatory obligation to take certain procedural steps to terminate the grant agreement, such as providing written notice of termination that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341(a). The Notice only provides vague references to "waste" and "accountability," among other things, with no supporting evidence or facts as to what OFN is alleged to have done wrong.

c.  EPA's termination of the grant has resulted in improperly withholding payment for allowable costs without establishing that OFN has either "failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6).

d.  EPA's termination of the grant has resulted in improperly withholding payment without first making a "determin[ation] that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 300.339. Although the Notice includes a vague reference to "material deficiencies" and asserts "these deficiencies … cannot be remedied by imposing specific conditions," EPA does not explain these statements or offer facts to support them.

e.  EPA's termination of the grant does not comply with 2 C.F.R. § 200.340(b), which states: "The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." EPA's termination decision is not grounded in the "terms and conditions of the Federal award." Instead, the termination is based on EPA's disagreement with the GGRF program.

116.    Although EPA's Notice states that EPA is terminating OFN's grant "[p]ursuant to [EPA's] authority under 2 C.F.R. §§ 200.339-40," those regulations do not provide EPA with grounds to terminate the grant.

    a.    2 C.F.R. § 200.339 applies only when "the recipient … fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." EPA has not provided any reasoned legal or factual basis to conclude the OFN has violated any constitutional provision, statute, regulation, or term or condition of the grant. Indeed, OFN has not violated any constitutional provision, statute, regulation, or term or condition of the grant.

    b.    2 C.F.R. § 200.340 permits termination "[b]y the Federal agency … if the recipient … fails to comply with the terms and conditions of the Federal award" or "[b]y the Federal agency … pursuant to the terms and conditions of the Federal award …." 2 C.F.R. § 200.340(a)(1) and (4). EPA has not provided any reasoned legal or factual basis to conclude that OFN has failed to comply with any Terms and Conditions of its grant.

117.    OFN is entitled to an injunction against EPA's wrongful action.

118.    Pursuant to 28 U.S. § 2201, OFN is entitled to a declaration that EPA's termination of the grant is not in accordance with federal regulations, in violation of the APA.

**COUNT THREE: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
NOT IN ACCORDANCE WITH THE INFLATION REDUCTION ACT
(CHALLENGE TO TERMINATION)
(Defendants EPA, Administrator Zeldin)**

119.    OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

121.    On March 11, 2025, EPA purported to terminate OFN's grant by delivering a Notice of Termination.

122.    EPA's termination of OFN's grant constitutes final agency action under the APA.

123.    EPA's termination of OFN's grant is not in accordance with law because it violates the Inflation Reduction Act. The Act requires EPA to spend the funds appropriated for grants to be awarded under the Greenhouse Gas Reduction Fund, 42 U.S.C. § 7434. EPA violated the Act because it has not satisfied the stringent requirements for rescinding an appropriation under 2 U.S.C. § 683.

124.    Even if EPA "re-obligate[s] lawfully appropriated funds within the GGRF program," *Climate United*, Dkt. 13-1, EPA's action would still be illegal. The Inflation Reduction Act sets a September 30, 2024 deadline for all grants to be awarded. 42 U.S.C. § 7434(a)(1), (2). Illegally terminating the entire CCIA program, and then re-awarding grants to unspecified new recipients, is inconsistent with that September 30, 2024 deadline.

125.    In addition, when Congress established the GGRF program, it laid out specific directives—not mere suggestions—as to what EPA could do with the money, and it provided specific deadlines and specific requirements for eligible recipients. Agencies are "not free simply to disregard statutory responsibilities." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). But that is what EPA would be doing if it were to re-obligate GGRF funds that were lawfully awarded.

126.    As a result of EPA's conduct, OFN has suffered and will continue to suffer irreparable injury.

127.    OFN is entitled to an injunction against EPA's wrongful action.

128.    Pursuant to 28 U.S.C. § 2201, OFN is entitled to a declaration that EPA's termination of the grant is not in accordance with the Inflation Reduction Act, in violation of the APA.

**COUNT FOUR: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
NOT IN ACCORDANCE WITH THE INFLATION REDUCTION ACT
(CHALLENGE TO SUSPENSION)
(Defendants EPA, Administrator Zeldin)**

129.    OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

130.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

131.    Prior to March 11, 2025, EPA effectuated a suspension of OFN's grant by causing Citibank to withhold OFN's grant funds.

132.    EPA's suspension of OFN's grant constitutes final agency action under the APA.

133.    EPA's suspension of OFN's grant is not in accordance with federal regulations, as described above. For example, EPA's actions resulted in improperly withholding payment for allowable costs without establishing that OFN had either "failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6).

134.    EPA's suspension of OFN's grant is arbitrary and capricious.

a.    EPA had no legal or factual basis to open a grand jury investigation into OFN's grant. Indeed, EPA's efforts to do so caused the Chief of the Criminal Division of

the United States Attorneys' Office in Washington, D.C. to resign from that office after 24 years of service.

b.  EPA had no legal or factual basis to cause a Freeze Letter to be issued to Citibank, or to cause Citibank or Treasury to freeze OFN's grant funds, particularly when the freeze "recommendation" was not supported by an order issued by a judge based on probable cause and cited no evidence.

c.  EPA had no legal or factual basis to direct Treasury to demand that Citibank stop disbursing funds. Further, Treasury's action did not comply with the FAA, which states that any freeze of OFN's accounts must occur in accordance with the ACA and must be lawful.

d.  EPA refused to meet with OFN, and never substantively responded to OFN's communications about its inability to access its funds—even while EPA was simultaneously acting to prevent OFN from accessing its grant funds.

135.    OFN continues to experience ongoing injury from the suspension because during the suspension period it has not received funds to which it is legally entitled. Further, even if the termination is enjoined, any suspension that remains in effect would cause harm to OFN.

136.    OFN is entitled to an injunction against EPA's wrongful action.

137.    Pursuant to 28 U.S.C. § 2201, OFN is entitled to a declaration that EPA's suspension of the grant is arbitrary, capricious, and not in accordance with law, in violation of the APA.

## COUNT FIVE: VIOLATION OF THE APPROPRIATIONS CLAUSE AND SEPARATION OF POWERS
### (Defendants EPA, Administrator Zeldin)

138.    OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

139.    The Appropriations Clause provides: "No Money shall be drawn from the Treasury, but in consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

140.    The provision of the Inflation Reduction Act authorizing the GGRF is an "appropriation" because it authorizes EPA to expend $27 billion for purposes of carrying out the GGRF program.

141.    In the Inflation Reduction Act, Congress "appropriated to the [EPA] Administrator … $8,000,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis." 42 U.S.C. § 7434(a)(3). The Appropriations Clause therefore forbids EPA From using appropriated funds to award grants after the statutory deadline.

142.    In the "Notice of Termination," EPA states: "EPA will work to re-obligate lawfully appropriated funds within the GGRF program …" Notice at 2. In doing so, EPA seeks to spend money in a manner Congress has not permitted, in violation of the Appropriations Clause.

143.    If EPA re-obligates GGRF's award funds to its preferred recipients, EPA would be violating Congress' intention for the funds to be obligated to clean-energy grants *that were completed prior to September 30, 2024.* By terminating all grants and re-obligating all the funds, EPA would be effecting a new grant-awarding program in 2025—after the September 30, 2024 deadline for GGRF awards has passed. 42 U.S.C. § 7434(a)(1)-(3).

144.    Moreover, "Congress sets the policy, not the [Administrator]," and "policy disagreements" with Congress's decision to fund these clean energy projects "is not a lawful

43

ground for the Administrator to decline to continue the congressionally mandated" GGRF program. *See In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013). "Congress speaks through the laws it enacts" and here, EPA has terminated programs established through lawfully enacted congressional appropriations without any basis in statutory authority. *Id.* EPA cannot shut down these programs completely and it cannot "decline to spend previously appropriated funds." *Id.*

145.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr, Inc.*, 575 U.S. 320, 327 (2015).[33]

146.    OFN is entitled to an injunction against EPA's wrongful action.

147.    Pursuant to 28 U.S.C. § 2201, OFN is entitled to a declaration that EPA's suspension and termination of the grant violate the Appropriations Clause.

## COUNT SIX: VIOLATION OF THE DUE PROCESS CLAUSE
### (Defendants EPA, Administrator Zeldin)

148.    OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149.    Under the Fifth Amendment to the United States Constitution, the government may not deprive a person or entity of a protected property interest without due process of law.

150.    OFN has a protected property interest in its award funds under the CCIA and in the accounts at Citibank to which those funds were disbursed.

151.    The government's actions preceding the termination, up to and including the termination, violated the Due Process Clause. For example:

---

[33] The APA independently authorizes OFN to bring this claim. 5 U.S.C. § 706(2).

a.  EPA caused Citibank to freeze OFN's assets without first obtaining a court order based on probable cause and supported by a sworn affidavit. Indeed, EPA Initiated the freeze despite a judge having expressly rejected an application for a seizure warrant on the basis that no probable cause existed.

b.  EPA never informed OFN that EPA was trying to freeze, suspend, or terminate OFN's grant award or its access to award funds, or that EPA was coordinating in secret with Treasury and FBI to direct Citibank to stop disbursing funds to OFN. EPA thus deprived OFN of its property in its award funds without providing OFN notice or an opportunity be heard prior to the initiation of the freeze.

c.  EPA also failed to provide OFN notice or an opportunity to challenge the freeze once it had been implemented. After OFN deduced that its funds had been frozen, EPA refused to respond to OFN's requests to provide an explanation and never notified OFN that its funds had been frozen at EPA's direction. At the same time— and again without providing OFN notice of its actions—EPA was continuing to pressure Citibank to keep OFN from accessing its funds in its accounts and ultimately directed Treasury to order Citibank to withhold OFN's funds.

d.  In an attempt to extend the unlawful freeze of OFN's assets, EPA issued the "Notice of Termination" without any legal or factual basis. It offered no notice or process to OFN before doing so; and the Notice provides no opportunity for OFN to challenge the purported "termination" of its award funds after the fact.

152.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr, Inc*., 575 U.S. 320, 327 (2015).[34]

## COUNT SEVEN: BREACH OF CONTRACT
### (Defendant Citibank)

153.    OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

154.    Citibank has a duty under the ACA to disburse OFN's award funds to OFN, as OFN requests. Under the ACA, Citibank "shall comply with all instructions, notification, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts," including instructions from "the Pledgor"—*i.e*., OFN. ACA § 2.

155.    When OFN requested that Citibank disburse award funds held in OFN's accounts in accordance with the ACA, Citibank failed to disburse such funds.

156.    Citibank has no legal or factual basis for failing to disburse award funds from OFC's accounts, as required by the ACA.

157.    Under the ACA, Citibank's duties with respect to OFN's award funding are exclusively "administrative or ministerial (and shall not be construed as fiduciary in nature)," and Citibank "shall not be responsible" for determining whether OFN's requests for the disbursement of award funds comply with any applicable contracts or laws. ACA at 3.

158.    The only condition under which Citibank is allowed to refuse OFN's request to disburse funds is if EPA has delivered a "Notice of Exclusive Control." EPA has not delivered such a Notice of Exclusive Control to Citibank.

---

[34] The APA independently authorizes OFN to bring this claim. 5 U.S.C. § 706(2).

159.    The FAA between Citibank and Treasury, to which OFN is not a party, does not provide Citibank with a legal basis to fail to disburse OFN's award funds as required by the ACA. The FAA authorizes Citibank to "freeze accounts" only "in accordance with" the ACA and in compliance with "lawful instructions or directions received from Treasury." But Citibank froze OFN's funds without following the ACA's termination provisions and based on instructions that were not lawful.

160.    By failing to disburse award funds held in OFN's accounts, Citibank has breached the ACA.

161.    Citibank's failure to disburse funds, as required under the ACA, has caused damage to OFN.

162.    OFN understands the predicament that EPA Placed Citibank in by instructing Citibank not to disburse funds to which OFN is lawfully entitled under the plain terms of the ACA. Even if its breach was understandable, Citibank plainly violated the clear terms of the ACA by refusing to honor OFN's request to disburse award funds to which it was lawfully entitled.

163.    Pursuant to 28 U.S.C. § 2201, OFN is entitled to a declaration that Citibank's failure to disburse funds from OFN's accounts is a breach of the ACA.

164.    OFN is entitled to an injunction against Citibank's wrongful refusal to honor OFN's disbursement requests.

## COUNT EIGHT: REPLEVIN
### (Defendant Citibank)

165.    OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

166.    OFN has an immediate legal right to possess the grant funds that OFN lawfully requested that Citibank disburse from OFN's accounts, pursuant to the ACA.

167.    Citibank has wrongfully detained the grant funds by unlawfully failing to disburse the grant funds that OFN lawfully requested.

168.    Citibank's intentional actions have caused damage to OFN.

## COUNT NINE: CONVERSION
### (Defendant Citibank)

169.    OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

170.    OFN has a legal right to possess and control the grant funds held in its accounts at Citibank, pursuant to the ACA.

171.    Citibank has wrongfully and intentionally exercised dominion or control over the grant funds in OFN's accounts, including by failing to disburse grant funds to OFN from OFN's accounts in response to OFN's valid and proper requests.

172.    Citibank has intentionally permanently or substantially interfered with OFN's property rights, including by failing to disburse grant funds to OFN from OFN's accounts in response to OFN's valid and proper requests.

173.    Citibank has acted without OFN's consent and has no legal abasis or valid justification for its actions.

174.    Citibank's intentional actions have caused damage to OFN.

175.    OFN is entitled to an injunction against Citibank's wrongful retention of OFN's funds.

176.    Pursuant to 28 U.S.C. 2201, OFN is entitled to a declaration that Citibank's failure to disburse funds from OFN's accounts constitutes a conversion of OFN's funds.

## PRAYER FOR RELIEF

WHEREFORE, OFN respectfully asks this Court:

1.     Declare that EPA's purported "Notice of Termination" is null, void, and of no legal effect;

2.     Declare that EPA and Administrator Zeldin's suspension and termination of the grant violates the Administrative Procedure Act because they are arbitrary and capricious, not in accordance with federal regulations, and not in accordance with federal statutes;

3.     Declare that EPA and Administrator Zeldin's actions violate the Appropriations Clause and Separation of Powers;

4.     Declare that EPA and Administrator Zeldin's actions violate the Due Process Clause;

5.     Enjoin EPA, Administrator Zeldin, and others in active concert or participation therewith, including officials at Treasury, from impeding Citibank from complying with its contractual obligations, or otherwise causing Citibank to deny, obstruct, delay, or otherwise prevent OFN from accessing its funds as permitted under the terms of the ACA and the grant award;

6.     Enjoin EPA and Administrator Zeldin from unlawfully suspending or terminating OFN's grant award except as permitted in accordance with the ACA, the grant award, and applicable law;

7.     Declare that Citibank's failure to disburse grant funds from OFN's accounts is a breach of the ACA;

8.     Order Citibank to process, disburse, and release all funds in accounts established in connection with OFN's grant, at OFN's request, in accordance with the ACA, both

with respect to requests OFN has already submitted and with respect to future requests;

9.   Order that Citibank may not transfer or otherwise move funds out of accounts established in connection with OFN's grant, except at OFN's direction as permitted under the ACA; and

10.  Grant such other and further relief as may be just and proper.

Dated: April 21, 2025                          Respectfully submitted:

                                               */s/  David B. Robbins*

Gabriel K. Gillett (*pro hac vice* forthcoming)   David B. Robbins (493976)
JENNER & BLOCK LLP                             Luke C. Platzer* (501274)
353 N. Clark Street                            Tanner J. Lockhead (90011928)
Chicago, IL 60654                              JENNER & BLOCK LLP
Tel.: (312) 840-7220                           1099 New York Avenue
ggillett@jenner.com                            Suite 900
                                               Washington, D.C. 20001
                                               Tel.: (202) 639-6040
                                               Fax: (202) 639-6066
                                               drobbins@jenner.com

                                               * Application to Court pending.

                                               *Attorneys for Plaintiff*
                                               *Opportunity Finance Network*